734 So.2d 1107 (1999)
Jeff WILSON, Appellant,
v.
STATE of Florida, Appellee.
No. 98-1736.
District Court of Appeal of Florida, Fourth District.
May 5, 1999.
Rehearing Denied July 20, 1999.
*1108 Richard L. Jorandby, Public Defender, and Mallorye Cunningham, Assistant Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Maya Saxena, Assistant Attorney General, Fort Lauderdale, for appellee.
TAYLOR, J.
In this appeal we consider the question whether a police officer conducting a lawful traffic stop may lawfully order a passenger, who has left the stopped vehicle, to return to and remain in the vehicle for the duration of the stop, absent a reasonable suspicion of criminal activity or belief that the passenger poses a threat to the officer's safety.
Jeff Wilson entered a nolo contendere plea to possession of cocaine, possession of marijuana less than 20 grams, and possession of drug paraphernalia, reserving the right to appeal the denial of his motion to suppress. Because we find that the deputy was not justified in detaining the appellant, for investigative or safety purposes, during the traffic stop, we reverse the denial of his motion to suppress evidence.
At the hearing on the motion to suppress, neither the state nor the defendant presented any live testimony. Instead, they stipulated to admission of the arresting officer's probable cause affidavit and his deposition testimony. According to this evidence, Deputy Sean Murray of the Palm Beach County Sheriff's Office was on patrol on July 6, 1997, when he observed a Ford Escort traveling above the speed limit in the northbound lane on Military Trail. He checked the tag and discovered that the tag was registered to a Chevy pick-up truck. Deputy Murray activated his emergency lights to stop the Ford Escort just as it turned into the parking lot of the Getaway Bar. The deputy parked behind the Escort, exited his patrol car and approached the driver's side of the Escort. *1109 The appellant, who was a passenger in the Escort, opened his door and started walking towards the Getaway Bar, which was only five or ten feet away. Deputy Murray stopped the passenger from entering the bar and instructed him to return to the vehicle and remain inside until the traffic stop was completed. The passenger complied with his instructions.
Deputy Murray explained that he instructed the passenger to return to the car and remain there for safety concerns. The officer expressed concern for his own safety because of the bar's unsavory reputation for shootings and other violent incidents among its patrons. Murray acknowledged that he had no reason to suspect the passenger of committing a crime or possessing any weapons or contraband. However, he said his personal standard procedure on traffic stops was to require all occupants to remain inside the vehicle until he concluded the stop.[1]
After the passenger re-entered the vehicle, Deputy Murray returned his attention to the driver. He noticed that the driver appeared to be extremely nervous and that his hands were shaking uncontrollably. He also observed the driver attempting to conceal something under the driver's seat of the car. At that point, the deputy removed the driver from the vehicle and patted him down. No weapons were discovered. Deputy Murray asked the driver for his driver's license. The driver responded that he did not have one. Whereupon, the deputy arrested the driver for driving without a license and placed him in the back seat of his patrol car. After placing the driver in his vehicle, the deputy headed back toward the Escort to obtain more vehicle information. As he approached the vehicle, Deputy Murray noticed the passenger trying to conceal something in the floorboard area. Peering through the passenger window, the deputy observed a brown drug pipe containing what he believed was marijuana on the floorboard beside the passenger's feet. He ordered the passenger out of the vehicle. While standing outside the vehicle, the passenger made a furtive movement as if he were trying to conceal something on his right side. The deputy patted him down for weapons. Although he did not discover any weapons, the deputy detected an odor of marijuana on the passenger's person. He searched the passenger and found a small plastic baggie containing cocaine. The deputy placed the passenger under arrest and charged him with possession of cocaine, possession of marijuana and possession of drug paraphernalia.
Appellant moved to suppress the evidence. He did not contest the lawfulness of the initial traffic stop; he argued that the deputy's ordering him to return to the vehicle and remain there for the duration of the stop constituted an unreasonable seizure under the Fourth Amendment. He contends that the trial court erred in denying his motion to suppress the evidence seized as a result of his unlawful detention.
We first observe that a trial court's ruling on a motion to suppress is clothed with a presumption of correctness and we must interpret the evidence and reasonable inferences derived therefrom in a manner most favorable to sustaining the trial court's ruling. See Rolling v. State, 695 So.2d 278, 291 (Fla.), cert. denied, ___ U.S. ___, 118 S.Ct. 448, 139 L.Ed.2d 383 (1997); Johnson v. State, 438 So.2d 774 (Fla.1983)( citing McNamara v. State, 357 So.2d 410 (Fla.1978)).
*1110 To justify a temporary detention of an individual, a law enforcement officer must have a founded suspicion of criminal activity. Moore v. State, 584 So.2d 1122, 1123 (Fla. 4th DCA 1991); State v. Stevens, 354 So.2d 1244 (Fla. 4th DCA 1978); § 901.151, Fla. Stat. (1997). A founded suspicion is one which has a factual foundation in the circumstances observed by the law enforcement officer, interpreted in light of the officer's knowledge and experience, indicating that the person detained either had committed, was committing or about to commit a crime. Bryant v. State, 577 So.2d 1372, 1374 (Fla. 1st DCA 1991).
At the hearing on the motion to suppress, the officer's deposition testimony revealed that he did not suspect the passenger of any criminal activity at the time he instructed him to return to the vehicle. The officer conceded that there was nothing unusual or suspicious about the passenger's behavior, but that it was simply his routine practice during traffic stops to request occupants to remain in the vehicle. Based on the officer's own testimony, we can conclude that he did not have the requisite founded suspicion of criminal activity for the stop. See Aguila v. State, 567 So.2d 1007 (Fla. 3d DCA 1990).
The state argues that, notwithstanding the absence of a founded suspicion for the passenger's detention, the deputy was justified in ordering the passenger to return to and remain in the vehicle to facilitate officer safety. In support of its position, the state analyzes the evolution of a series of automobile stop cases, whose constitutional principles, it contends, permit the police procedure utilized in this case. The state begins its analysis with Doctor v. State, 573 So.2d 157 (Fla. 4th DCA 1991), approved in part, quashed in part, 596 So.2d 442 (Fla.1992), wherein this court held that "when a police officer lawfully stops a car for a traffic infraction, his order to the driver or passenger to get out of the car is reasonable and permissible under the Fourth Amendment even though at the time of the stop the officer has no reason to suspect foul play from the particular driver or passenger." We explained in Doctor that:
An officer's interest in protecting himself or a fellow officer against an unsuspected assault by a driver or passenger and against accidental injury from passing traffic is both legitimate and weighty and the intrusion into the driver's or passenger's personal liberty is de minimis. See Pennsylvania v. Mimms, 434 U.S. 106, 109-11, 98 S.Ct. 330, 332-33, 54 L.Ed.2d 331, 336-37 (1977).
Id. at 159.
Mimms set forth a "bright line" rule allowing officers to order a lawfully stopped driver from the vehicle. The Supreme Court reached its conclusion after balancing the public interest in allowing this practice against the driver's right to personal security free from arbitrary interference by law enforcement. The Court reasoned that once the driver is already lawfully stopped, the incremental intrusion in requiring the driver to be detained outside the vehicle "can only be described as de minimis." Mimms, 434 U.S. at 111, 98 S.Ct. 330. Balanced against this "mere inconvenience" is the "legitimate and weighty" interest in protecting the officer's safety against criminal attacks. Id. at 110, 98 S.Ct. 330.
In Maryland v. Wilson, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), the Supreme Court extended the above rationale to passengers and held that a police officer may, as a matter of course, order the passengers in a lawfully stopped vehicle to exit the vehicle pending completion of the stop. The Court recalled its balancing analysis under the Fourth Amendment in the Mimms decision and noted that "[o]n the public interest side of the balance, the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger." Id., 117 S.Ct. at 885. Citing statistics, the Court noted that in 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits *1111 and stops. Id. The Court observed, however, that one significant safety factor in Mimms was absent in Wilson: the danger to the officer of standing by the driver's door and in the path of oncoming traffic. Yet, the Court added, the "fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer." Id., 117 S.Ct. at 885. A primary concern highlighted in Wilson was a passenger's access to weapons:
Outside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment. It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.
Id., 117 S.Ct. at 886.
This court recently applied Mimms and Wilson in upholding the validity of a police officer's directive to a driver to return to his vehicle for the remainder of a lawful traffic stop. See Borski v. State, 712 So.2d 787 (Fla. 4th DCA 1998). In Borski, we determined that the "personal liberty versus officer safety" balancing analysis in Mimms and Wilson applied with equal force to such a command to a driver.
We now have before us the separate question whether a passenger can be ordered to return to and remain in the vehicle while the police complete a traffic stop. We must, therefore, decide if we should extend our ruling in Borski to passengers as well as to drivers. This case, in contrast to Borski, raises a separate and significant issue concerning the authority of a police officer to make a seizure of someone who is not suspected of any violation of the law and who does not pose an articulable suspicion of danger to officer safety. As the Supreme Court explained in Mimms, supra, "the touchstone of our analysis under the Fourth Amendment is always `the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security'," Mimms, 434 U.S. at 108-109, 98 S.Ct. 330 (quoting Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), and the reasonableness "depends `on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers'," id. at 109, 98 S.Ct. 330 (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).
In Wilson, the Supreme Court deemed the intrusion of asking a driver and passenger to step outside a stopped vehicle to be "de minimis" when balanced against the interest of police safety. As mentioned above, the Court presented statistical data on the high percentage of police assaults and homicides that occur during traffic stops and suggested that the risk of assaults and fatalities would be significantly reduced by ordering occupants outside the vehicle.
Logic and a reasonable interpretation of Wilson would suggest, then, that a principal risk mentioned therein, i.e., passenger access to weapons potentially concealed inside a car, would be increased if passengers were forced back inside the vehicle. No empirical data was offered in Wilson as justification for ordering passengers back inside the vehicle for safety purposes. In fact, the Supreme Court expressly declined the State of Maryland's invitation to "hold that an officer may forcibly detain a passenger for the entire duration of the stop." Wilson, 117 S.Ct. at 886 n. 3, 117 S.Ct. 882.
On the personal liberty side of the scale, the Supreme Court pointed out that as a practical matter, passengers are already stopped by virtue of the stop of the vehicle, so that the additional intrusion of ordering them out of the vehicle is minimal. Id., 117 S.Ct. at 886. However, in our view, a command preventing an innocent *1112 passenger from leaving the scene of a traffic stop to continue on his independent way is a greater intrusion upon personal liberty than an order simply directing a passenger out of the vehicle. Such an arbitrary interference with the freedom of movement of one who is not suspected of any illegal activity whatsoever cannot be classified as a de minimis intrusion.
We have no difficulty determining, as we did in Doctor and Borski, that the traffic violation sufficiently justifies subjecting the driver to detentionin or outside the vehicle. There is a legitimate need for adequate police control over the traffic violator for the time necessary to conclude the business of the stop. The restraint on the liberty of the blameless passenger is, in contrast, an unreasonable interference. As Justice Stevens said in his dissent in Maryland v. Wilson, "[t]he Constitution should not be read to permit law enforcement officers to order innocent passengers about simply because they have the misfortune to be seated in a car whose driver has committed a minor traffic offense." Wilson, 117 S.Ct. at 889. A wholly innocent passenger should have the right to choose whether to continue on with his business or return to the vehicle and remain by his driver-companion's side.
In a case that involved a seizure issue similar to ours, Dennis v. State, 345 Md. 649, 693 A.2d 1150 (1997), a passenger in a lawfully stopped vehicle ignored a police command to remain in the vehicle, and instead, walked away from the scene and subsequently resisted police attempts to detain him. His conviction of disorderly conduct and battery was reversed by Maryland's highest appellate court, which, upon remand from the United States Supreme Court, reaffirmed its prior holding that there was no valid detention. Dennis held that a police officer could not legally detain a passenger simply for the general purpose of officer safety; detention required at least an articulated reasonable suspicion that the passenger was engaged in activity justifying a Terry stop. Further, the Maryland court found it significant that there was no explanation why it was safer for the officer to detain the passenger than allow him to walk away from the scene. We note that some jurisdictions have reached a contrary result and permitted routine orders to passengers to remain inside the vehicle. See, e.g., State v. Webster, 170 Ariz. 372, 824 P.2d 768, 770 (App.1991).
In the instant case, the officer expressed a generalized safety concern because of the location of the traffic stop, i.e. the parking lot of a bar known for rowdy patrons, but he could not articulate any facts attributable to the appellant's behavior or appearance that created a suspicion of illegal activity or danger to his safety. Appellant had already left the vehicle and was about to enter the bar when he was ordered back to the car and told to get inside. He did nothing to warrant this restriction on his right to move about freely and simply walk away from the police encounter. The deputy conceded that when he ordered appellant to return to the vehicle, he did not intend to detain him for investigative questioning; he was merely following his standard traffic stop procedures for safety.
The Fourth Amendment, applicable to the states through the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), has consistently been interpreted as prohibiting routine and arbitrary seizures of innocent citizens. We find that the individual liberty interests at stake here outweigh the generalized safety concerns. There is little or no evidence to support the belief that the typical traffic stop of ordinary citizens gives rise to sudden violence or unruly behavior justifying wholesale seizures of automobile passengers, unsupported by any individualized suspicion. We recognize, of course, that circumstances may arise which give a prudent and cautious officer reasonable grounds for commanding a passenger to return to and remain in a stopped vehicle. See, e.g., Rogala v. *1113 District of Columbia et al., 161 F.3d 44 (D.C.Cir.1998)(detention of passenger during traffic stop, while police officer conducted field sobriety tests upon driver, was not unlawful seizure under Fourth Amendment, where passenger did not seek to leave the scene, and officer merely required passenger to remain in the car, rather than in the street or on the sidewalk, in light of officer's concerns about his safety, passenger's creation of traffic hazard, and passenger's interference with field sobriety test). However, in those situations requiring an officer to direct a passenger to return to and remain in the vehicle, the officer should be able to identify objective circumstances that support the reasonableness of his order and not rely solely on standard routine or police protocol.
For the reasons stated above, we decline to extend our holding in Borski v. State to passengers, and hold that a police officer conducting a lawful traffic stop may not, as a matter of course, order a passenger who has left the stopped vehicle to return to and remain in the vehicle until completion of the stop. The officer must have an articulable founded suspicion of criminal activity or a reasonable belief that the passenger poses a threat to the safety of the officer, himself, or others before ordering the passenger to return to and remain in the vehicle.
Because we find that the evidence in this case was seized as the result of an unlawful detention of the appellant, we reverse the order of the trial court denying his motion to suppress physical evidence.
REVERSED and REMANDED.
GROSS, J., concurs.
SCHACK, LARRY, Associate Judge, concurs specially with opinion.
SCHACK, LARRY, Associate Judge, concurring specially.
I agree with the analysis and conclusion reached in Judge Taylor's well-reasoned opinion. I write only to make it clear that the use of the words "innocent passenger," "blameless passenger" and "innocent citizens" mean someone who, at the time of the law enforcement encounter, is not suspected of any violation of the law, and who does not pose an articulable suspicion of danger to officer safety.
NOTES
[1] There was conflict between the officer's sworn statement in his probable cause affidavit that he "instructed the passenger ... to immediately return to the vehicle" and his deposition testimony that he merely "requested" the passenger to do so and that the passenger voluntarily complied with his request. The state below argued that there was no "seizure" but a consensual encounter. However, in ruling on the suppression motion, the trial judge concluded that the officer ordered the passenger to return to and remain in the vehicle. On appeal, the state did not dispute appellant's characterization of the officer's actions as an "order" and apparently abandoned its position that no seizure occurred.